**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FLEETWOOD PACKAGING, a )
Division of Signode Industrial Group )
LLC, )
            )
       Plaintiff, )
            )     No. 14 C 9670
       v. )
            )     Judge John J. Tharp, Jr.
JOHN HEIN and DUBOSE )
STRAPPING, INC., )
            )
       Defendants. )
            )

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the plaintiff's emergency motion for a temporary restraining order.

Plaintiff Signode Industrial Group LLC ("Signode")[1] seeks to enjoin its former employee, John

Hein, now employed by defendant DuBose Strapping, Inc. ("DuBose"), from using confidential

information and trade secrets in soliciting customers he sold business to on Signode's behalf

during the twelve months before he left Signode's employ. Jurisdiction is premised on diversity.[2]

For the reasons explained below, Signode's motion for a temporary restraining order is denied.

---

[1] References to "Signode" in this opinion refer only to the portion of Signode's business conducted by Fleetwood Packaging, one of its divisions.

[2] Signode filed its complaint in the Circuit Court of Cook County on December 4, 2014. The defendants removed the case the same day. According to the notice of removal, with which Signode has taken no issue, Signode Industrial Group LLC has one member, Signode Industrial Group US Inc., incorporated in Delaware; its principal place of business is Cook County, Illinois. Defendant Hein is alleged to be a citizen of Oregon; defendant DuBose is incorporated, and maintains its principal place of business, in North Carolina.

# BACKGROUND[3]

Signode manufactures and sells strapping products and packaging materials. DuBose is one of its principal competitors. Signode employed defendant John Hein as a salesman from 2001 until September 10, 2014; during that period, Hein served as the Territory Manager for a seven-state region in the northwestern United States. Before working for Signode, Hein worked for several years as a sales representative for a strapping company called A.J. Gerrard, a competitor of Signode. According to Hein, Signode hired him from Gerrard because of the customer relationships he had developed there. During the last seven years of his tenure at Signode, Hein focused entirely on selling strapping products to customers in the metal industry. For about ten years, until 2011, Hein reported directly to Jeff Kellerman, who was the President of the division.

Kellerman subsequently became the Chief Operating Officer of DuBose in June 2014. At that time, he contacted Hein and advised him that DuBose was interested in developing business on the west coast. During ensuing discussions about the possibility of Hein moving to DuBose, Kellerman told Hein not to provide him with any information about Fleetwood. Hein resigned from Signode on September 10, 2014, and started working at DuBose two days later. Both Hein and Kellerman expressly deny that Hein has provided any documents or other information about Signode's business to DuBose.

Hein gave two weeks' notice to Signode on September 10, but Mike Zimmer, Vice President and General Manager of Signode's Fleetwood Packaging division, terminated Hein's

---

[3] This information is culled from the allegations of the verified complaint and the affidavits submitted by Michael Zimmer and Christopher Tragasz, on behalf of Signode, and by John Hein and Jeff Kellerman on behalf of the defendants.

employment the next day. Zimmer told Hein that his company-issued laptop computer would be sent for analysis and that he should remove any personal files from the computer; according to Hein, Zimmer refused Hein's request that Signode's IT personnel assist with that process. Signode's forensic analysis of Hein's computer, conducted on or about September 22, 2014, prompted concerns that Hein had copied confidential Signode documents to a number of external storage devices, specifically an external hard drive and nine flash drive devices. On October 10, 2014, Signode demanded that Hein produce those devices for examination. Hein produced the hard drive and two flash drive devices and represented that he did not possess any of the other flash drives. The results of Signode's analysis of Hein's laptop and the external storage devices he provided to Signode are discussed in more detail below.

Based on its forensic review, Signode concluded that Hein had misappropriated confidential information. On December 3, Signode filed the complaint in this matter, along with a motion for a temporary restraining order and preliminary injunction, in the Circuit Court of Cook County. The defendants removed the matter to this Court the next day and a hearing on the TRO motion was held on December 8, 2014.

Signode identifies three types of information that, it alleges, are protected by these provisions and have been misappropriated by Hein. First, it maintains that the identities of its customers, and their contact information, are protected and that Hein therefore cannot contact companies he knows to be Fleetwood's customers. Signode also contends that, in contacting these customers, Hein is using Signode's "Contribution to Profit Reports" and "product matrices" to enable him (on behalf of DuBose) to undercut Signode's pricing. Mike Zimmer (who verified Signode's state court complaint), supplied an affidavit describing these reports. "Contribution to Profit Reports," which are shared with customers, describe discounts, services,

3

and additional products that Signode provides to specific customers "and the savings the customer realized based on these contributions." (Zimmer ¶¶ 8–12.) Product matrices, by contrast, contain information "about vendors, vendor names, product costs and relevant delivery information" in response to product requests from sales personnel. These documents are used to generate quotes for customers, but are not themselves shared with customers. (Zimmer ¶¶ 13–15.) Access to product matrices, but not Contribution to Profit Reports, is restricted within the company.

## DISCUSSION

Signode asserts counts alleging breach of contract (Count I), violation of the Illinois Trade Secrets Act (Count II), and tortious interference with contract (Count III).[4] The premise of each of these claims is that Hein misappropriated confidential information in the weeks leading up to his resignation on September 10, 2014, and even afterward, and has used that information on behalf of his new employer. Signode seeks, among other relief, an injunction barring the defendants from contacting any Signode customers that Hein called on during his last year of employment, or as to which he obtained confidential information during his last year of employment, with Signode. *See* (Compl., at ¶¶ 13, 16, and 18.)

At present, Signode seeks a temporary restraining order barring such customer contacts pending a hearing on a motion for a preliminary injunction. "A temporary restraining order or a preliminary injunction is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008) (citing *Goodman v. Illinois*

---

[4] The parties do not dispute that Illinois law governs the substance of the claims at issue.

*Dept. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). The standard governing temporary restraining orders is the same as that for preliminary injunctions. *Lee v. Orr*, 13-CV-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) (citation omitted). In determining whether to grant injunctive relief, courts consider whether the moving party has demonstrated: (1) some likelihood of success on the merits, (2) there is no adequate remedy at law, and (3) irreparable injury will occur without obtaining the relief sought. *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets these requirements, courts then balance the harm to the non-moving party if injunctive relief is granted against the harm to moving party if relief is denied. *Planned Parenthood of Indiana, Inc.*, 699 F.3d at 972. The Seventh Circuit uses a sliding scale when weighing the harm to a party against the merits of the case. "The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Id.* (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008)). Finally, courts consider the public interest involved, including the effects of the injunctive relief on non-parties. *Id.*; *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *1 (N.D. Ill. December 3, 2004).

On the record before the Court, Signode has not made a sufficient showing in support of its motion to show that an immediate TRO is warranted.

## I.      LIKELIHOOD OF SUCCESS ON THE MERITS

Based on the evidence presented in support of, and opposition to, the TRO motion, the Court concludes that there is little, if any, likelihood that Signode will succeed on the merits of either its trade secret claim or its claims based on its confidentiality agreement with Hein. Most

of the information Signode identifies does not warrant trade secret protection and, to the extent that the identified information is protectable, Signode fails to establish that Hein has misappropriated it, disclosed it, or used it improperly. For largely the same reasons, the evidence does not establish a substantial likelihood of success on the contract-based claims, which also appear to fail in any event because the Confidentiality Agreement appears to be unenforceable under Illinois law.

## A.    The Illinois Trade Secrets Act

To establish a violation of the Illinois Trade Secrets Act ("ITSA"), a plaintiff must show: (1) the existence of a trade secret; (2) the misappropriation of the trade secret; and (3) the use of the trade secret in the defendant's business. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992).

### 1.    Existence of a Trade Secret

The information Signode seeks to protect fails to satisfy the requirements for protection as trade secrets under Illinois law or confidential information under the Confidentiality Agreement. Illinois law defines a trade secret as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

### a.     Customer Information

To begin, there is no question that customer lists can warrant protection as trade secrets, but it is plaintiff's burden to show that a customer list is "sufficiently secret" to warrant such protection. *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 677 (Ill. App. 1989). The ITSA therefore conditions trade secret status on two principal conditions: (1) the information must actually be sufficiently secret and of a nature that its secrecy provides economic value; and (2) the company must take steps to preserve its secrecy commensurate with the value derived from its secret nature. 765 ILCS 1065/2; *Serv. Ctrs. of Chi., Inc. v. Minogue*, 180 Ill. App. 3d 447, 454–55, 535 N.E.2d 1132, 1136–37 (Ill. App. 1989) . Signode has not met its burden with respect to either requirement (or, more accurately, has not demonstrated any likelihood that it will be able to meet its burden to establish that these conditions are satisfied).

Signode has adduced no evidence to establish that the identity of its customers is information that constitutes a valuable secret. To the contrary, Mr. Zimmer's affidavit acknowledges that "Signode and DuBose sell similar type products and compete for customers on a national basis." (Zimmer ¶ 3.) Signode does not disagree; its Complaint acknowledges that "DuBose and Signode compete for the same customers and compete for sales of similar types of products to these customers." (Compl. ¶ 14) Zimmer nevertheless asserts that DuBose would have been required to expend substantial time and expense to identify the Signode customers with which Hein had dealt because DuBose previously did not have a salesman in the territory that Hein covered. It is true that customer lists may warrant protection when it would take considerable time and resources to develop them. *See, e.g., Learning Curve Toys, Inc. v PlayWood Toys, Inc.*, 342 F.3d 714, 728–29 & n.8 (7th Cir. 2003) (citing cases). But a vendor's

customer list is not "sufficiently secret" when those customer identities are readily available in a public directory, and the vendor provides a service commonly utilized by a particular class of potential customers. *Id.*; *see also, e.g., Charles River Labs., Inc. v. Beg,* No. 14 C 1170, 2014 WL 4100714, at *3 (N.D. Ill. Aug. 19, 2014) (customer and contact information not a trade secret because witness testified that such information was "readily available to the public through third party vendors"). The affidavits of both Hein and Kellerman establish that the identities of strapping customers in the metal industry are easy to discern; each rebuts Zimmer's assertion by attesting that there are a relatively small number of metal industry strapping customers and that their identities are generally known throughout the industry and are in any event readily ascertainable through trade publications, industry reference guides, trade show participation, and other publicly available information. Both also confirm that various customers in the industry send out requests for bids to many potential strapping suppliers. Zimmer did not contradict these representations. Moreover, both Hein and Kellerman had also worked in the strapping industry for companies other than Signode and they therefore also had an independent basis for familiarity with the customers that Signode competed for. Based on this evidence, there is not an adequate basis to conclude that the identity of Signode's customers was a secret that offered substantial economic value.[5]

_____

[5] It seems more likely that the value Hein may provide to DuBose in connection with Signode's customers derives from the relationship and goodwill that he may have established with those companies rather than their identities *per se*. And companies may protect their investments in their relationships with customers by entering into reasonable non-compete agreements with employees. Signode, however, had no such agreement with Hein; when it proposed such an agreement in March 2014, after Hein had been working for the company for 13 years, Hein declined to sign it.

Because the identity of its customers does not appear to be a valuable secret, it is perhaps not surprising that Signode does not take reasonably necessary steps to preserve the secrecy of its customer lists. Customer lists can constitute trade secrets only where reasonable steps to preserve secrecy have been taken, such as encrypting the lists or requiring review in only restricted-access rooms. *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005); *see also, e.g., Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004) (finding that computer access restrictions and security keycards were reasonable steps to protect secrecy); *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 589, 651 N.E.2d 209, 216 (Ill. App. 1995) (finding "reasonable efforts to maintain [customer list] secrecy" through use of physical locks, garbage checks, special computer access codes, need-to-know access restrictions, strict removal restrictions on hard copies, and security cameras). There is no evidence, however, that Signode did anything to keep the identity of its customers secret, other than requiring some employees, like Hein, to sign confidentiality agreements. The confidentiality agreement itself, however, is insufficient to imbue Signode's customer list with secrecy. *See First Fin. Bank, N.A. v. Bauknecht*, ---F. Supp. 3d---, 2014 WL 5421241, at *15 (C.D. Ill. Oct. 24, 2014); *Arcor v. Haas,* 363 Ill. App. 3d 396, 402–03, 842 N.E.2d 265, 271 (2005) (holding trial court abused its discretion in granting a preliminary injunction when trade secret holder relied solely on a confidentiality agreement to protect its information).

### b.      Contribution to Profit Reports

With respect to the two types of reports that Signode alleges Hein has misappropriated, it seems clear as an initial matter that Signode's Contribution to Profit reports do not constitute trade secrets or confidential information. They are provided to customers with no confidentiality restrictions attached to them; customers are free to do anything they wish with them. Signode has

not explained why these reports specifically are entitled to any protection whatsoever, and it conceded at the TRO hearing that they are not trade secrets. Signode has not provided any evidence at all that it treats these reports as confidential information and, so far as the record indicates, they are available to employees throughout the company.

### c. Product Matrices

By contrast, Signode's "product matrices" appear to warrant protection as trade secrets. These reports disclose the information with which Signode formulates its prices; they are not shared with customers; they are kept in a separate password-protected database; and their distribution is restricted even within the company. These are the kinds of characteristics that distinguish trade secrets and confidential information. *See Computer Assocs.*, 333 F. Supp. 2d at 696 (finding computer access restrictions to be reasonable steps to protect secrecy); *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 792, 772 N.E.2d 768, 781 (Ill. App. 2002) (stating rule that pricing formulas are entitled to trade secret protection when not generally known to others and could not be acquired through general skills and knowledge common in the industry) (citing *Serv. Ctrs. of Chi., Inc. v. Minogue*, 180 Ill. App. 3d 447, 454–55, 535 N.E.2d 1132, 1136–37 (Ill. App. 1989)).

### 2. Misappropriation

Although Signode's product matrices appear to constitute trade secrets, there is insufficient evidence to suggest that Hein misappropriated that information. To support its misappropriation allegations, Signode presents the affidavit of a computer forensics consultant, Christopher Tragasz, who examined the hard drive on the laptop computer Hein used at Signode. Based on that examination, Tragasz found that ten different external storage devices had, at various times, been connected to the laptop. Signode demanded that Hein produce those devices

for inspection; Hein produced three—an external hard drive and two flash drives—and represented in his affidavit that he does not have any of the other storage devices identified in Tragasz's report. Hein stated that he had occasionally been asked to copy presentations he had given to flash drives of customers (or potential customers) and that it was possible that these occasions accounted for the other devices listed in Tragasz's report.

Tragasz summarized his findings in four exhibits attached to his affidavit. In Exhibit A, Tragasz listed files that Hein had "accessed on the Signode Hard Drive [on the laptop computer issued to Hein] between August 4, 2014, and September 12, 2014; based on their file names, many of these seem likely to have included customer information that was at least confidential in nature. In addition, Signode takes particular note of the last file on the list, which bears the name "Dubose Business Plan West Coast.docx," and a last-accessed date of August 3, 2014, more than a month before Hein resigned from Signode. Exhibit B to the Tragasz affidavit lists some 900 files, many of which again appear to contain confidential customer information, which were last-accessed by Hein on August 20, 2014, about three weeks before Hein left the company. Tragasz states that "[t]he fact that these files contain the same last accessed date suggests that these files were potentially copied, in mass, to another storage device or to a computer." Exhibit C contains a listing of files which, Tragasz opines, "based on file names, [are] potential Signode files saved or copied to" a flash drive Hein provided to the company. Exhibit D contains a list of four files, also copied to a flash drive that Hein provided to the company, which relate to what all acknowledge to be a Signode client called "Steelscape."

Signode maintains that Hein accessed these files in connection with his plan to go to work for DuBose so that he could use the trade secrets and confidential information they contained to steal Signode's clients. At present, however, Signode has provided no evidence that

Hein "misappropriated" any trade secrets or confidential information of Signode or that he has used such information to lure Signode clients to DuBose. Contrary to Signode's arguments, the activity revealed in the Tragasz report does not demonstrate any malfeasance by Hein (or DuBose), particularly when considered in light of affidavits submitted by Hein and by Jeff Kellerman, currently DuBose Strapping's COO and formerly the President of Fleetwood Packaging, which presently stand unrebutted.

To begin, Exhibit A to the Tragasz report establishes, at most, that Hein accessed the files listed while still an employee of Signode. Hein admits as much; his affidavit states that he accessed the documents "in connection with my position at and work for [Signode]" and "did not share any of [this information] with DuBose or anyone else." (Hein ¶ 16.) It is hardly noteworthy, much less probative of misappropriation, that Hein accessed confidential information in the course of his employment at Signode. Signode does not argue that Hein was not authorized to access any of these files or that his access to these files was unrelated to work he was doing on behalf of Signode. The presence of a document entitled "DuBose Business Plan West Coast" on Hein's hard drive does not change the analysis; Hein concedes that he was talking to DuBose about employment in August but that fact falls far short of establishing that from that point forward the files he accessed were for the purpose of luring customers to DuBose rather than to perform his duties for Signode. That may be a possibility, but a mere possibility does not suffice even as a matter of pleading a claim, much less proving one.

Hein also offers an unrebutted explanation for the files listed in Exhibit B, which were all accessed on August 20, 2014. Hein's affidavit explains that he backed up his company issued laptop computer annually to an external hard drive and then deleted the files from his laptop. Having done so with the files listed in Exhibit B (all appear to have "last written" dates before

October 2013), Hein states that he was tasked in the summer of 2014 by Fleetwood Vice President and General Manager Mike Zimmer "to prepare a report that required accessing historical data for certain customers." (Hein ¶ 15.) Per his affidavit, Hein attempted to restore an entire folder containing his backups to his laptop but was unable to do so; he then accessed the necessary files individually from the external drive. On its face, Hein's version of these events appears to provide an innocent explanation for why all of these files show the same "last accessed" date a few weeks before his departure. While this explanation may or may not ultimately prove to be credible, Signode has not yet presented any evidence to contradict it. Signode provided an affidavit from Mr. Zimmer with its reply brief, for example, but that affidavit does not address Hein's claim that Zimmer asked him to prepare a report during the summer of 2014 that required access to historical customer information. Having failed to offer contrary evidence, Signode presents no reason for the Court to discount Hein's version of these events.

Exhibits C and D list files found on the two flash drives that Hein provided to the company. Hein's affidavit explains that, after giving notice of his resignation to Signode, Hein asked Zimmer if Fleetwood IT personnel could assist him in removing any personal files from his laptop. According to Hein, Zimmer refused this request and required Hein to do it himself, which he did by downloading files from the laptop onto two flash drives. Again, Signode fails to offer any evidence to contradict this account. Further, although Tragasz opines that the files listed on Exhibit C are "potential Signode files," an examination of the file names reveals that they are consistent with the description provided by Hein in his affidavit: personal files and photographs. None of the file names listed on Exhibit C suggest the misappropriation of Signode confidential information. While Signode's counsel argued at the TRO hearing that Signode

cannot yet ascertain whether Hein downloaded other documents, on other devices, that argument effectively concedes that *these* documents do nothing to establish that speculative possibility.

Finally, with respect to Exhibit D, Hein concedes that the four files listed relate to Signode's customer Steelscape. He represents that he does not know precisely how or why the files were on the flash drive in question, but speculates that they may have been on the drive before he downloaded his personal files to it upon his resignation. While speculative, this explanation is at least plausible, given the "file created" and "last written" dates of March 2013; as Hein's affidavit notes, these four files each appears to contain information that was at least a year-and-a-half old when Hein resigned from Signode. Signode further points to the "last accessed" dates of 9/20/14 for these files (10 days after Hein resigned, and a week after he had removed personal files from the laptop) as evidence that he continued to access Signode's confidential data after he began working for DuBose, but several facts make the Court quite skeptical of the probative force of that last accessed date. Specifically, the date and time for each of the four files is exactly the same: precisely at midnight on 9/20; this suggests that some factor other than random manual intervention accounts for the creation of this access date. In addition, the fact that Signode has found no other evidence that any file was accessed after Hein completed the removal of his personal files on 9/12/14 substantially undermines Signode's hypothesis that Hein was continuing to misappropriate data relating to Signode's former customers. That Hein cannot affirmatively explain the presence of these four files on the flash drive does not establish that the files must therefore have been misappropriated. It is Signode's burden to establish that fact and, again, Signode offers no evidence to rebut Hein's explanation. Indeed, Signode has produced no evidence that Hein has even contacted Steelscape, much less that he has used any of the information in these files to gain Steelscape's business for DuBose.

14

Standing alone, as it presently does, the Tragasz report establishes only that Hein had four files relating to a single client on a flash drive that he provided to the company. It does not establish that Hein misappropriated those four files, or any others, or that he used any company information in soliciting customers for DuBose. Signode may ultimately be able to present evidence to demonstrate that Hein's version of these events is not credible, but it has not done so at this stage. That fact, coupled with its inability to show that Hein had in his possession any more than four files relating to a single customer suggests, if anything, that Signode's claims of wholesale misappropriation of confidential customer data lacks foundation. There is, then, no evidentiary foundation whatsoever for Signode's assertion that Hein has misappropriated any of Signode's trade secrets or confidential information. That state of affairs requires denial of its TRO motion, because Signode has no prospect for success on the merits of any of its claims if it has no evidence that Hein improperly took that information from Signode.

### 3. Disclosure or Improper Use

Further, Signode has also failed to provide any evidence that Hein disclosed any trade secrets or confidential information to DuBose, or that he used that information himself in order to solicit his former Signode customers. In lieu of evidence of actual unauthorized use, Signode argues inevitable disclosure: that Hein "must" have used, and inevitably will continue to use, its trade secret information in order to undercut its pricing. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). The inevitable disclosure doctrine concerns situations where a former employee, even when acting in good faith, cannot help but subconsciously incorporate his former employer's trade secrets into the execution of his job duties for his new employer. *See PepsiCo*, 54 F.3d at 1270 (describing the high likelihood that the former employee "might be faced with a decision that could be influenced by certain confidential information that he

15

obtained while at [his former employer]"). In order to trigger the inevitable disclosure doctrine, a plaintiff must show more than the possibility that defendants *could* misuse the plaintiff's trade secrets; it must show that the defendants *will* misuse those secrets. *Teradyne, Inc. v. Clear Commc'ns Corp.*, 707 F. Supp. 353, 357 (N.D. Ill. 1989).

This argument might carry some force if customer identities and contact information were protectable trade secrets, but as discussed above, they are not. Limiting the analysis solely to the product matrices, the only protectable information that Signode has identified, Signode's inevitable disclosure argument requires acceptance of the doubtful premise that no competitor could have offered a better price to a strapping customer than did Signode without access to Signode's pricing methodology, a claim that does not bear scrutiny. DuBose competed with Signode before Hein joined them, and it can only be inferred that DuBose sometimes won business over Signode even without any inside information about Signode's pricing methodology. Moreover, the argument assumes that DuBose would be willing to undercut Signode's pricing without regard to its own costs and profit margins, an assumption that is neither self-evident nor supported by evidence. Indeed, to the contrary, Jeff Kellerman's affidavit makes the point that DuBose prices are based on its own internal cost and profit calculus, not by reference to those of competitors. (Kellerman ¶ 10; *see also* Hein ¶ 27) (prices are "subject to minimum cost, freight, and margin requirements set by others at DuBose").)

The inevitable disclosure doctrine speaks to situations in which a former employee, by virtue of "extensive and intimate knowledge," cannot avoid taking into account the confidential information carried with him from his former employer in performing his new role. That does not describe the situation presented in this case, where the concern is that the former employee is affirmatively using ephemeral pricing information to undercut the prices offered by his former

employer. In the context of this dispute, Hein would have to intentionally misappropriate Signode's trade secrets in order to compare Signode's pricing methodology, on a customer-by-customer basis, with DuBose's own pricing methodology. This falls short of the type of trade secret at issue in *PepsiCo*, where a high-level employee left his employer, armed with "extensive and intimate knowledge about [the former employer's] strategic goals," to be "the person in charge" of developing a directly competing strategy in a new and rapidly growing market. 54 F.3d at 1266, 1269. For these reasons, Signode falls short of meeting its burden on showing its likelihood of succeeding on the merits of its trade secret claims.

### B.     Breach of Contract and Tortious Interference

The Confidentiality Agreement Hein executed in 2001 bars disclosure of "confidential information," a term defined to include, without limitation, "product design and development, manufacturing processes, formulas, price lists, customer lists, vendor lists, marketing and other strategic plans, computer programs and software." Signode alleges that Hein breached this contractual agreement by using its confidential customer list, Contribution to Profit reports, and product matrices to solicit business from the Signode customers he sold to while employed at Signode. To prevail on the tortious interference with contract claim against DuBose, Signode must establish, in addition to Hein's breach, that DuBose intentionally induced that breach. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55, 545 N.E.2d 672, 676 (Ill. 1989); *TABFG, LLC v. Pfeil*, 746 F.3d 820, 823 (7th Cir. 2014).

#### 1.     The evidence is insufficient to support any claim of breach or tortious interference.

For largely the same reasons discussed with respect to the trade secret claim, the evidence fails to clearly show that Hein breached the confidentiality agreement he signed when he began

his employment with Signode in 2001. The evidence presented to date establishes that Contribution to Profit reports were not confidential and that Hein was familiar with, and had relationships with, strapping customers in the metal industry independent of his employment with Signode. The confidentiality agreement defines confidential information to include "customer lists," but there is no basis to conclude that Hein stole any data compilation of Signode's customers; rather, the evidence shows only that he has continued to call on a handful of companies who were customers of Signode but whose identity as buyers of strapping products is readily ascertainable from publicly available information and so cannot be considered confidential. Nor is there sufficient evidence that Hein misappropriated or used any other purportedly confidential information from Signode. And regardless of whether Hein breached the Confidentiality Agreement, Signode has adduced no evidence whatsoever to support a claim that DuBose induced him to breach that agreement; the statements of Hein and Kellerman that DuBose, through Kellerman, affirmatively disavowed any interest in information about Signode's business stand uncontroverted.

### 2.     The confidentiality agreement is unenforceable.

Even if Signode had adequately established that Hein had disclosed and/or used confidential information, its claims based on breach of the confidentiality agreement would still fail because the agreement is unenforceable. Under Illinois law, employers can protect confidential information that does not rise to the level of a trade secret by means of a restrictive covenant, such as a confidentiality agreement. But under Illinois law, any such restrictive covenant must be reasonably limited in scope (geographical and durational) in order to mitigate its potentially anticompetitive effects. *Cincinnati Tool Steel Co. v. Breed*, 136 Ill. App. 3d 267, 275, 482 N.E.2d 170, 175 (Ill. App. 1985) (confidentiality agreements are subject to the same

requirements for reasonableness that apply to covenants not to compete); *Disher v. Fulgoni*, 124 Ill. App. 3d 257, 262, 464 N.E.2d 639, 643 (Ill. App. 1984) (same).[6] Thus, "a contract forbidding disclosure of customer information is enforceable—but only if the contractual prohibition is reasonable in time and scope and, specifically, only if its duration is limited." *American Family Mut. Ins. Co. v. Roth*, 485 F.3d 930, 933 (7th Cir. 2007) (applying Wisconsin law, but citing cases, including *Cincinnati Tool,* from other jurisdictions to support the point).

The Confidentiality Agreement that Hein signed in 2001 contains no limitations as to either its geographic reach or its duration. It purports to bar Hein from using confidential information anywhere, for any purpose, for perpetuity. It is therefore unenforceable. *See AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987) (contractual confidentiality provision held unenforceable where it contained no limitations on geographic scope or duration). The fact that Signode now seeks to enforce the agreement by restricting Hein's use of confidential information for only a year does not make the agreement enforceable. Courts regularly refuse to "blue-pencil" restrictive covenants to render them more reasonable, recognizing that to do so removes any incentive for employers to offer reasonable agreements at the outset of the employment relationship. *E.g.*, *N. Am. Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 416, 526 N.E.2d 621, 625 (Ill. App. 1988); *Boyar-Schultz Corp. v. Tomasek*, 94 Ill. App. 3d 320, 324, 418 N.E.2d 911, 914 (Ill. App. 1981); *see also Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 456–57, 879 N.E.2d 512, 528 (Ill. App. 2007) (explaining employer

---

[6] After enactment of the ITSA, restrictive covenants regarding trade secrets are no longer subject to this requirement but it has not been abrogated with respect to confidential information that does not warrant protection as a trade secret.

incentives as the reason behind courts' strong reluctance to equitably reform restrictive covenants).[7]

Because the Confidentiality Agreement is unenforceable, Signode has no prospect of success on claims asserting that Hein breached the agreement or that DuBose induced Hein's breach and no TRO can issue on the basis of these claims.

## II. Adequacy of Remedy at Law and Irreparable Injury

As Judge Cole recited in *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 803–04 (N.D. Ill. 2011):

> [E]ven if [the plaintiff seeking injunctive relief] had demonstrated a likelihood of success on the merits, it would still have to show that without injunctive relief, it is "likely" to suffer irreparable harm for which there is no adequate remedy at law. *Winter* [*v. Natural Res. Def. Council*, 555 U.S. 7, 21 (2008)]. Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the Court's characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id. See also Chicago United Industries, Ltd. v. City of Chicago,* 445 F.3d 940, 945 (7th Cir. 2006) (district court erred by not requiring "persuasive showing of irreparable harm.").

On this record, there seems little reason to expect that Hein has been, or will be, particularly successful in his efforts to entice his former Signode customers to follow him to DuBose. To date, the evidence reflects that only a single Signode customer (Cascadia) has

---

[7] Even when courts have found judicial reformation to be warranted, the challenged restrictive covenants needed only slight modification to become reasonable. *See Gillespie v. Carbondale*, 251 Ill. App. 3d 625 (Ill. App. 1993) (approving a judicial modification of a covenant from a 50-mile radius around any of employer's locations to a 50-mile radius around only the locations where former employee had worked); *Total Health Physicians, S.C. v. Barrientos*, 151 Ill. App. 3d 726, 730, 502 N.E.2d 1240, 1242–23 (Ill. App. 1986) (holding that a trial court could modify a covenant's vaguely defined geographic scope by adding specificity or limiting its coverage area as necessary to preserve reasonableness). In contrast, Signode's proposed modification would a create a durational limitation where none existed before, and would still fail to address the unlimited geographical coverage of the restriction.

responded to Hein's overtures by purchasing strapping products from DuBose, and Signode has offered no information about the size of that order, or its significance in terms of its overall business with Cascadia, or its overall business generally. Nor has it offered evidence showing that Cascadia dealt exclusively with Signode before Hein's jump to DuBose; for all one can tell from this record, Cascadia may have done even more business with DuBose during Hein's tenure with Signode. Signode can be expected to continue to market to any customers that DuBose entices, yet it provides no reason to expect that its efforts to retain customers would be unsuccessful. These gaps in the record preclude a finding that injury (much less irreparable injury) is likely to occur unless the court enjoins Hein's activities.

Moreover, to the degree that Hein succeeds in luring business away from Signode, and that success can be attributed to misappropriation of confidential information, damages for lost profits may prove adequate. Signode maintains that lost profits cannot be calculated reliably, but it has not convincingly explained why that is so. "[T]here is no *per se* rule that claims of lost profits are invariably uncalculable." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986). Here, that calculation would require analysis only of the profit derived from Hein's sales to customers who switched (in whole or part) to DuBose relative to those of his replacement. *See, e.g., Pampered Chef*, 804 F. Supp. 2d at 806–07 ("It would not seem particularly difficult to calculate lost sales in this case. . . . It would not appear to be complicated to compare the sales records before the departure of the 17 individuals with the sales levels after their departure."). Signode maintains that the loss of customer goodwill cannot readily be calculated, but there is no reason to believe that the loss of Hein would translate to the loss of goodwill for Signode itself; the only "goodwill" lost in this scenario is the goodwill Signode enjoyed by virtue of Hein's relationship with the customer. As the Seventh Circuit noted in

*Lawson*, any interest Signode had in Hein's "'goodwill' would be adequately compensated in lost profit damages since any injury would presumably not extend beyond the insular salesperson-customer relationship to the corporation in general." *Lawson*, 782 F.2d at 1441. Signode might have also attempted to minimize that loss by means of a reasonable non-compete agreement (*see* note 8, above), but never even attempted to do so until Hein had been working at the company for 13 years, a fact that further weakens its contention that the loss of such goodwill will impose substantial and incalculable losses on the company.

That Signode did not file this "emergency" motion for a TRO until almost three months after Hein resigned also undermines its irreparable harm contention, particularly in the context of a motion for a TRO. Based on its forensic review of Hein's laptop, Signode had the information reported in Exhibit A of Tragasz's affidavit by about September 22, 2014, as well as the information indicating that numerous external storage devices had accessed the laptop. Nevertheless, Signode did not assert any claim at that time and did not contact the defendants to seek review of those devices until October 10. For reasons not explained, Signode did not complete its examination of those devices until November 19, 2014,[8] and then devoted another two weeks to efforts to work out a resolution of the dispute with DuBose. While the Court does not suggest that Signode has not been diligent in its efforts to address the violations it perceives, and certainly its efforts to resolve the dispute informally are commendable, this timeline belies its argument the harm that may result from the alleged inducement of the breaches of the employment contracts, before an evidentiary hearing on a preliminary injunction motion can be conducted, is immediate or irreparable, as required to support granting a TRO.

---

[8] Signode does not attribute any portion of the delay to foot-dragging by the defendants in providing the storage devices for examination.

The "common formula" is that TROs are intended to preserve the status quo only for so long as is needed to hold a hearing. *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003)). Signode has not convinced the Court that barring a single former employee from contacting only customers he sold to during his last year of employment from contacting those customers will cause it harm that cannot be remedied within the next 28 days (the longest period a TRO can remain in effect absent agreement) by entry of a preliminary injunction.

## III. Balance of Harms

Finally, even if Signode could establish that Hein had misappropriated trade secrets (or other confidential information) in the form of its product matrices, and was using that information to help him formulate bids to undercut Signode's pricing, the Court would still conclude that the balance of harms weighs more heavily against imposing the requested TRO in this matter—although in the context of a short-term TRO, the significance of this imbalance is relatively minor.

First, as between Signode and Hein, the harm done to Hein by erroneously issuing the requested injunctive relief would outweigh the harm done to Signode by erroneously denying that injunctive relief. A TRO would preclude Hein (and DuBose) from contacting the body of potential customers most likely to do business with him, namely those to whom he has successfully sold business over the past year. Signode, by contrast, would not be precluded from soliciting business from those, or any other, customers. Thus, to a significant degree, granting the requested relief would effectively impose a non-compete agreement on Hein. That was decidedly not the import or intention when the parties executed a confidentiality agreement in 2001, as

evidenced by the fact that Signode sought to obtain a non-compete agreement from Hein many years later.

For similar reasons, the Court finds that the public interest here favors denial of injunctive relief. Denial favors greater competition in the marketplace and does no violence to policies surrounding restrictive employment covenants, which employers should be required to obtain through reasonable agreements with employees rather than post-termination efforts to restrict competition.

\*      \*      \*

For the reasons set forth above, the Court denies Signode's motion for a temporary restraining order.

Dated: December 15, 2014

John J. Tharp
United States District Judge