UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FLEETWOOD PACKAGING, a Division of Signode Industrial Group LLC, | )<br>)<br>) |
| Plaintiff, | ) No. 14 C 09670<br>) |
| v. | ) Judge John J. Tharp, Jr.<br>) |
| JOHN HEIN and DuBOSE STRAPPING, INC., | )<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Fleetwood Packaging (herein, "Signode"), a division of Signode Industrial Group, alleges that its former employee, John Hein, misappropriated trade secrets and breached his confidentiality agreement, and that his current employer, DuBose Strapping, tortiously interfered with Hein's contract with Signode. This Court previously denied Signode's motion for a temporary restraining order. Thereafter, the plaintiff filed its First Amended Complaint, and the defendants moved to dismiss it for failure to state a claim on which relief can be granted. For the reasons that follow, the defendants' motion is grant in part and denied in part.

## FACTS

Although the parties already conducted limited discovery and presented evidence in support of, and in opposition to, the plaintiff's motion for a temporary restraining order, the universe of facts is considerably smaller for purposes of this motion. Moreover, for purposes of its TRO motion, the plaintiff had the burden of demonstrating that it had some chance of success of the merits, that is, a greater than negligible chance of winning. *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). At this stage, however, the plaintiff's burden is merely to set forth sufficient allegations to state a claim for relief that is plausible.

1

*Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (motion to dismiss). All factual allegations in the complaint are accepted as true, and reasonable inferences are drawn in favor of the plaintiff. *Virnich*, 664 F.3d at 212. Accordingly, the following facts are taken solely from the Amended Complaint and will be viewed in the light most favorable to the plaintiff.

Signode[1] manufactures and sells strapping products and packaging materials in a competitive industry. Amended Complaint, Dkt. 20 ¶¶ 1, 15. DuBose is one of its principal competitors. *Id*. ¶ 10. John Hein worked for Signode (and its predecessor in interest) as a salesman from 2001 until September 11, 2014. *Id*. ¶¶ 17, 27. Hein worked as the Territory Manager for a seven-state region in the northwestern United States. *Id*. ¶ 18. His responsibilities as the Territory Manager included activities such as managing and expanding existing customer relationships, developing new customers, and pricing strategies. *Id*. ¶ 18. Before coming to Signode, Hein had years of experience in the industry. *Id*. ¶ 17.

As a condition of his employment, Hein entered into a confidentiality agreement in 2001 with Illinois Tool Works, Inc., a company whose industrial packing business Signode later acquired.[2] *Id*. ¶ 17. Hein's confidentiality agreement states, in part, that Hein will not disclose or use "any confidential information" relating to the business either during or after his employment. *Id*. ¶ 22. The confidentiality agreement further identifies confidential information as "price lists, customer lists, [and] vendor lists" among other types of information. *Id.*

---

[1] References to "Signode" refer only to the portion of Signode's business conducted by Fleetwood Packing, one of Signode's divisions, and the nominal plaintiff. The Amended Complaint refers to the plaintiff as "Signode" and the Court follows suit.

[2] On January 1, 2014, Illinois Tool Work contributed, transferred, and assigned to Signode all of its rights, titles, and interest in and to any and all of the company's assets primarily related to the industrial packing business. Amended Complaint, Dkt. 20 ¶ 22 n.1.

Around August 20, 2014, Hein met with executives from DuBose to discuss his employment at that company. *Id.* ¶ 26. Hein then gave two weeks' notice to Signode on September 10, 2014. *Id.* ¶ 27. Signode terminated his employment the next day. *Id.* Signode retained a computer forensic expert shortly thereafter to analyze Hein's company laptop. *Id.* ¶ 34. The forensic examination indicated that "[o]n multiple occasions and without authorization, Hein connected unauthorized removable storage devices to his Signode laptop and copied to them Signode's trade secrets and confidential information." *Id* ¶ 28. On August 20, the same day he interviewed with DuBose, Hein had "downloaded, copied or otherwise accessed over 900 documents, which included Product Matrices, Contribution Reports, pricing documents, sales figures, and rebate information, among many others." *Id* ¶ 26. Signode notified both Hein and DuBose about the forensic results, and Hein's confidentiality agreement, and requested that Hein return all property to Signode in order for Signode to examine the ten external drives that were identified during the forensic investigation. *Id.* ¶¶ 26, 34, 37. Signode received three of the ten external drives. *Id.* ¶ 35.

Among the types of information that Signode concluded had been compromised were the identities and contact information of its customers, its Contribution to Profit Reports ("Contribution Reports"); and its so-called product matrices. Contribution Reports, which are shared with customers, described discounts, pricing terms, services, and additional benefits that Signode provides to specific customers. *Id.* ¶ 11. Signode has implemented some procedures to maintain the confidentiality of these reports. *Id.* ¶ 16. Such procedures include limited dissemination, a corporate policy to mark documents containing confidential information as "Confidential," employee confidentiality agreements, and an annual requirement that employees

certify that they have read and received Signode's Principles of Conduct, which preclude the disclosure of Signode's confidential information. *Id*.

Product matrices contain information about the product at issue, vendors, product costs, and relevant delivery information in response to product requests from sales personnel. *Id*. ¶ 11. These documents are used to generate quotes for customers, but are not themselves shared with customers. *Id*. In addition to the procedures to maintain Signode's secrecy listed above, Signode's product matrices are uploaded to a database that is restricted to a limited group of employees. *Id*. ¶ 16. Hein's access to the database, which required a unique password to submit a request, was limited to initiating requests for pricing. Access to product matrices is restricted within the company. *Id*.

According to the complaint, after leaving Signode, Hein accessed Signode's confidential information and trade secrets. *Id*. ¶ 29. Nine days after departing Signode Hein accessed "files relating to Signode's customer Steelscape." Hein then contacted Steelscape on behalf of DuBose. Other Signode customers have informed Signode that Hein has solicited their business for DuBose. Cascadia Metals, one of Hein's customers at Signode, has advised Signode that it will now be purchasing materials from Hein at DuBose, which gave Cascadia Metals a price lower than Signode's. *Id*. ¶ 30. Signode believes that Hein's intimate knowledge and possession of confidential information allowed him to undercut Signode's prices. *Id*.

Based on these factual allegations, Signode brings three claims: (1) violation of the Illinois Trade Secrets Act against both Hein and DuBose; (2) breach of contract against Hein; and (3) tortious interference with contract against Dubose.

## DISCUSSION

In order to survive dismissal under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations need only be sufficient to raise the possibility of relief above the "speculative level." *Twombly*, 550 U.S. at 555.

### I.     Trade Secret Misappropriation

Signode claims that Hein and DuBose misappropriated its trade secrets in the form of its "carefully cultivated customer contacts," its Contribution Reports, and its product matrices. The defendants argue that this claim must be dismissed because Signode fails to sufficiently allege the existence of a trade secret or any misappropriation and use by the defendants.

Under the Illinois Trade Secrets Act ("ITSA"), "to state a cause of action for misappropriation of trade secrets, a plaintiff must allege facts that the information at issue was: (1) a trade secret; (2) that was misappropriated; and (3) used in the defendant's business." *Alpha Sch. Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 740, 910 N.E.2d 1134, 1152 (2009)[3]; *see also Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). Illinois law defines a trade secret as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the

---

[3] At least one Court in this district has concluded, based on *Liebert Corp. v. Mazur,* 357 Ill. App. 3d 265, 827 N.E.2d 909, 924–25 (1st Dist. 2005), that under Illinois law, "use " is not actually a separate element, but instead, is one way to show misappropriation (the others being improper acquisition and unauthorized disclosure). *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1004-1005 (N.D. Ill. 2008). Here, however, the plaintiff does not dispute that to prevail it must establish "use."

circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Relevant factors in determining whether a trade secret exists include: "(1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which it is known by the employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Alpha Sch. Bus Co.*, 391 Ill. App. 3d at 740, 910 N.E.2d at 1152.

The defendants first contend that Signode has not alleged the existence of single trade secret because the information is not protectable and was not sufficiently guarded by Signode. Mem., Dkt. # 26 at 9. To begin, there is no question that customer lists can warrant protection as trade secrets. *See, e.g., Learning Curve Toys*, 342 F.3d at 728-29 & n.8; *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (2000) ("[Company's] customer lists, which it alleged take considerable effort, time, and money to compile, could be deemed a trade secret."). But it is the plaintiff's burden to show that a customer list is "sufficiently secret" to warrant such protection. *See Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 677 (1989). It is similarly the plaintiff's job to demonstrate that it took considerable effort, time, and resources to build its customer list. *See Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 588, 651 N.E.2d 209, 215 (1995)) ("The key factor to establishing secrecy is the ease with which the information can be readily duplicated without involving considerable time, effort or expense.").

Although Signode does not have to prove anything at the pleading stage, it has not pleaded any facts to suggest that its customer list could plausibly meet either requirement under 765 ILCS 1065/2(d). Signode alleges that it "has invested significant time and expense in developing its relationships with its customers around the country" and that its "comprehensive customer list is not publicly known." Am Compl., Dkt. # 20 ¶ 13. But Signode has not provided a single detail about how it built the customer list and, more importantly, what steps it takes to keep its customer contacts secret. To the contrary, Signode acknowledges in its complaint that "Dubose and Signode compete for many of the same customers nationally, and compete for sales of the same types of products to these customers." Am. Compl., Dkt. # 20 ¶ 12. In a niche industry that Signode describes as highly competitive, Signode provides to factual allegations rendering it plausible that the limited universe of potential customers could somehow be secret as between the firms competing for the exact same business. Signode simply fails to allege facts suggesting that the identity of its customers is a secret that it does, or can, guard inside the company with reasonable measures.

Signode also seeks trade secret protection for its Contribution Reports, which it describes as reports—shared with its customers—that describe discounts, pricing terms, services, and additional benefits that it provides to specific customers. Am. Compl., Dkt. # 20 ¶ 11. But as the defendants point out, information shared with customers with no confidentiality restrictions attached to them does not warrant trade secret protection. *See Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 793, 772 N.E.2d 768, 782 (2002) (denying trade secret protection for customer "equipment service history" because the service history "was not secret"—plaintiff would provide it to a customer if requested). Signode does not effectively answer this argument.

Finally, there are the product matrices, which Signode has sufficiently alleged to be trade secrets at the pleading stage. These documents contain information about a particular product, including, vendors, costs, and relevant delivery information, for the purposes of setting prices. *See Outsource International, Inc. v. George Barton & Barton Staffing Solutions,* 192 F.3d 662, 668 (7th Cir. 1999) (cost and pricing figures, and comparable rates protectable as trade secrets). And importantly, product matrices are not provided to Signode's customers. *Id.*; *see Delta Med. Sys.*, 331 Ill. App. 3d at 792, 772 N.E.2d at 781 (stating rule that pricing formulas are entitled to trade secret protection when not generally known to others and could not be acquired through general skills and knowledge common in the industry) (citing *Service Centers of Chicago, Inc. v. Minogue*, 180 Ill. App. 3d 447, 454-55, 535 N.E.2d 1132, 1136-37 (1989)). Signode has implemented procedures to maintain the secrecy of these reports, such as limited dissemination, a corporate policy to mark documents containing confidential information as "Confidential," employee confidentiality agreements, and an annual requirement that employees certify that they have read and received Signode's Principles of Conduct, which preclude the disclosure of Signode's confidential information. Signode's product matrices are stored in a database that is restricted to a limited group of employees within the company. *See Elmer Miller, Inc. v. Landis*, 253 Ill. App. 3d. 129, 134, 625 N.E. 338, 342 (1993) (finding limited employee access to known confidential information in a closed draw as reasonable measures to maintain secrecy in a small business). Hein did not have access to the database and could only request product matrices for customers; whatever reports he obtained by request were to be kept confidential inside the company. These allegations sufficiently indicate reasonable efforts to maintain the secrecy of the information. *See Strata Mktg., Inc. v. Murphy,* 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (2000); *Jackson v. Hammer,* 274 Ill.App.3d 59, 68, 653 N.E.2d 809, 816 (1995) ("[T]he

Act requires a plaintiff to take 'affirmative measures' to prevent others from using information."); *see also Learning Curve Toys,* 342 F.3d at 725 ("Whether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury.").

The defendants argue, however, that even if Signode pleaded the existence of a trade secret, its allegations are insufficient with respect to the elements of misappropriation and use. The ITSA defines "misappropriation" as either (1) acquisition of a trade secret by one "who knows or has reason to know that the trade secret was acquired by improper means;" or (2) "disclosure or use of a trade secret" by one who "at the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was…derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." 765 ILCS 1065/2(b); *see Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 503 (7th Cir. 2011) ("A claim of trade secret misappropriation, then, requires that the information have a status of secrecy and that a confidential relationship be breached.").

Signode points to the forensic examination of Hein's computer indicating that he had connected a number of external drives to Signode's laptop on August 20, 2014, allowing him to download Signode's data including product matrices. Hein met with executives from DuBose to discuss his employment at that company around the same day he downloaded Signode's data, permitting the reasonable inference that he did not intend to use the information for Signode's benefit. Signode notified both Hein and DuBose about the forensic results, and requested that Hein return all property to Signode. Signode received three of the ten external drives and no assurances that Hein would be kept from disclosing any confidential information. These allegations permit an inference that Hein, acquired product matrices by improper means or for an

improper purpose. *See Twombly*, 540 U.S. at 570; *see also Stampede Tool Warehouse*, 272 Ill. App. 3d at 590, 651 N.E.2d at 217 ("[A] trade secret can be misappropriated by physical copying or by memorization.").[4]

Finally, the defendants argue that Signode insufficiently alleges that its competitor, DuBose, used Signode's alleged trade secrets. But the facts asserted in the complaint permit a reasonable inference of use by DuBose. First, Hein departed Signode for a similar job in the same territory, for a competitor who did not previously have a presence in that territory. Hein is now attempting to sell the same products to the same customers, on behalf of a different employer, making his knowledge of Signode's pricing inputs highly relevant. Under the circumstances, the potential for use of Signode's confidential pricing data clearly was high. Moreover, the complaint alleges that since leaving Signode, Hein in fact has accessed files he took from Signode. In particular, Hein is alleged to have accessed Steelscape's data and then called on Steelscape on behalf of DuBose. The complaint further alleges that Hein obtained Cascadia Metals' business for DuBose by undercutting Signode on price. These examples lend sufficient plausibility to the claim that Hein and DuBose actually used Signode's trade secrets.

Signode alternatively argues that its trade secrets will be inevitably disclosed by way of Hein's employment at DuBose. The inevitable disclosure doctrine concerns situations where a former employee cannot help but to rely on his former employer's secrets in performing his duties for a new employer. *See Strata*, 317 Ill. App. 3d at 1070, 740 N.E. 2d. at 1178; *PepsiCo,*

---

[4] It bears repeating that the standard for evaluating the sufficiency of the plaintiff's pleading differs from that applicable to the Court's previous consideration of the motion for a temporary restraining order. The Court previously held that, based on the evidence presented in support of the TRO motion, Signode could not establish any significant likelihood of success on the issue of misappropriation. That preliminary factual determination is entirely different from the issue presented here, which is whether the allegations pleaded in the complaint, taken as true, plausibly suggest misappropriation.

*Inc. v. Redmond*, 54 F.3d 1262, 1268-69 (7th Cir. 1995). Given the near identity of Hein's jobs at Signode and DuBose—selling the same products to the same customers—there is at least facial plausibility to the claim that he could not help but take Signode's confidential pricing information into account when trying to competitively price products for DuBose. However, given the passage of time, and the competitive nature of the industry, it is also doubtful that the information Hein obtained from Signode remains relevant for any period of time.[5] And, of course, DuBose's pricing must rely on factors, such as its own supply network and costs, that have nothing to do with Signode, which belies the plaintiff's suggestion that simply knowing Signode's pricing structure would allow DuBose to undercut Signode's prices. The Court has already found sufficient allegations of actual use; it need not, therefore, resolve whether the inevitable disclosure doctrine applies here.

In light of the foregoing, Signode has adequately pleaded a claim of trade secret misappropriation as to its product matrices.

**II.     Breach of Contract and Tortious Interference with Contract**

The defendants next argue that Signode fails to plead sufficient allegations to state plausible claims of breach of contract (by Hein) and tortious interference (by DuBose), both of which depend on the existence of an enforceable contract.

As a threshold matter, the defendants maintain that Signode does not have standing to enforce Hein's confidentiality agreement, because it is between Hein and ITW, Signode's predecessor in interest, and Signode has not established a valid assignment of the agreement. The contract, which, as an exhibit to the complaint, is part of the pleadings, *see* Fed. R. Civ. P. 10(c),

---

[5] For this reason, among others (including the sparse allegations of any actual lost business), there is ample reason to doubt Signode's ability to prove any significant damages caused by the alleged misappropriation and breach of contract.

says nothing about assignment, and the Amended Complaint alleges only: "On January 1, 2014, Illinois Tool Work Inc., ('ITW') contributed, transferred, and assigned to Premark Packaging LLC (now known as Signode Industrial Group LLC) all of ITW's rights, titles, and interest in and to any and all of ITW's assets primarily related to the industrial packaging business, which included the Signode business." In their briefs, the parties refer to a 2014 Business Contribution Agreement ("BCA") between ITW"s subsidiary, Premark Packaging LLC, and Signode and argue its significance to the issue of the assignment of the confidentiality agreement. But the proper interpretation of the BCA, which is not part of the pleadings, is not appropriate to consider on this motion to dismiss. The parties did not request an evidentiary hearing on the issue of standing. Accordingly, the Court cannot resolve the contested issue of the assignment of the confidentiality agreement in the context of this motion.

The defendants next contend that the confidentiality agreement is unenforceable as a matter of law because it lacks limits on duration and geographic scope that are required in order for a restrictive covenant to be reasonable under Illinois law.

Under Illinois law, employers can protect confidential information by means of a restrictive covenant, such as a confidentiality agreement. Although Illinois law views some restrictive covenants skeptically as restraints on trade, it will enforce the covenants to protect legitimate business interests. *See, e.g., Instant Technology LLC v. DeFazio*, 793 F.3d 748, 450 (7th Cir. 2015) ("In Illinois a restrictive covenant in an employment agreement is valid only if it serves a 'legitimate business interest.'") (citing *Reliance Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2011)); *American Family Mut. Ins. Co. v. Roth,* 485 F.3d 930, 933 (7th Cir. 2007) ((contract that forbids disclosure of customer information is enforceable—"but only if the contractual prohibition is reasonable in time and scope, and, specifically, only if its duration

is limited") (applying Wisconsin law, but citing Illinois cases for support)); *Lawrence & Allen, Inc. v. Cambridge Human Resources Group, Inc.*, 292 Ill. App. 3d 131, 138, 685 N.E.2d 434, 443 (1997) ("A restrictive covenant's reasonableness is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions."). In *Cincinnati Tool Steel Co. v. Breed,* 136 Ill. App. 3d 267, 276, 482 N.E.2d 170, 175 (2d Dist. 1985), the Illinois Appellate Court expressly held that durational and geographic limitations are required for a confidentiality agreement to be enforceable. The confidentiality agreement that Hein signed in 2001 contains no such limitations. Confidentiality Agreement, Dkt. # 20-1. If *Cincinnati Tool* remains good law, then, the confidentiality agreement is in jeopardy given its unlimited temporal and geographic scope.

The plaintiff contends, however, that the confidentiality agreement is saved by the ITSA's provision that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty." 765 ILCS 1065/8(b)(1). Signode argues that this provision abrogated *Cincinnati Tool* and, further, that it applies to confidential information of all stripes, not just trade secrets, and therefore the confidentiality agreement is broadly enforceable.

This Court has already concluded that §1065/8(b)(1) did not abrogate *Cinncinati Tool* and other Illinois law requiring reasonable temporal and geographic restrictions in restrictive covenants, except as to trade secrets. No Illinois court has stated that the statute overruled or abrogated *Cincinnati Tool*, and its reasoning remains persuasive as to confidential information that falls short of a trade secret. *See Roth*, 485 F.3d at 933 (7th Cir. 2007) (citing *Cincinnati Tool* as persuasive authority for the proposition that "[t]reating customer information as a trade secret limits competition as well, but such information is given enhanced legal protection as a trade

13

secret only if there is some indication that the information has value apart from its value in limiting competition—that it represents an investment on the part of the firm seeking to protect it"). The plaintiff relies on *Coady v. Harpo, Inc.*, 308 Ill. App. 3d 153, 162, 719 N.E.2d 244, 251 (1999), which held that a confidentiality agreement was enforceable although it lacked time or geographic restrictions. Citing §1065/8(b)(1), the court stated: "[A] confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets *and confidential information* are involved."*Coady,* 308 Ill. App. 3d at 161, 719 N.E.2d at 250. But the appellate court did not explain why §1065/8(b)(1) could apply to "confidential information" where it appears in a provision of the Trade Secrets Act and expressly refers only to contracts "to maintain secrecy or limit use of a *trade secret*." Absent any indication the court actually considered whether §1065/8(b)(1) overruled *Cincinnati Tool* as to all types of confidential information, this Court will not take it upon itself to be the first court to so hold. Given the plain language of §1065/8(b)(1) and the fact that *Cincinnati Tool* has never been overruled or expressly limited, this Court is of the view that only unlimited agreements to keep trade secrets, not other information, confidential are exempted from the longstanding rule that requires nondisclosure agreements to include reasonable limits on scope.

Therefore, given the absence of any reasonable limitations in Hein's confidentiality agreement, it is enforceable only as to trade secrets, and only because of §1065/8(b)(1). (The defendants have not challenged enforceability on grounds other than standing and the lack of reasonable limits.) Signode has alleged the existence of a trade secret—its product matrices—that is covered under the broader rubric of "confidential information" that the contract forbids Hein to disclose or use. Thus, to the extent that Signode seeks to enforce the agreement as to its alleged trade secrets, the agreement does not fail for want of limits on duration and geographic

scope, and the breach of contract claim does not fail altogether. Although the contract is not enforceable as to any confidential information that is not a trade secret, the breach of contract claim survives the motion to dismiss, as limited by this discussion. And, therefore, the tortious interference claim also does not fail at the pleading stage for want of an enforceable contract.

The defendants further argue, however, the tortious interference claim[6] must be dismissed because Signode fails to sufficiently allege that Hein breached the agreement[7] and that DuBose induced the breach, and further that the claim is preempted by the ITSA. The latter two arguments are sound. There are simply no factual allegations in the complaint that lend plausibility to Signode's claim that DuBose intentionally caused Hein's breach of confidentiality. Signode does not allege any intentional action by DuBose to cause Hein to disclose or use Signode's trade secrets; simply hiring Hein does not suffice when, by Signode's own admission, DuBose did not know about the confidentiality agreement until Hein was already employed there. Signode suggests, but fails to support the argument that tortious interference could arise from DuBose's failure to take certain unspecified measures to mitigate the potential damage to Signode *after* learning about the agreement (and well after hiring Hein).

In any event, the issue of inducement is immaterial. Given that the Court has concluded that the confidentiality agreement is enforceable, as to trade secrets only, by operation of § 1065/8(b)(1), the ITSA preempts the tort claim because it is premised on the exact same facts

---

[6] To establish a tortious interference with a contract claim under Illinois law, "a plaintiff has the burden of proving the following elements: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages." *Echo, Inc. v. Timberland Machines & Irrigation, Inc.*, 661 F.3d 959, 968 (7th Cir. 2011) (citing *Purmal v. Robert N. Wadington & Associates,* 354 Ill.App.3d 715, 727, 820 N.E.2d 86, 98 (2004)).

[7] This argument fails for the same reasons the Court determined that Signode adequately pled misappropriation and use for purposes of the trade-secrets claim.

15

as the misappropriation claim. The Act is the exclusive remedy for such claims. *See* 765 ILCS § 1065/8(a); *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) ("This statute abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the Act itself"); *Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc.*, No. 14 C 8160, 2015 WL 5693594, at *4, *7 (N.D. Ill. Sept. 24, 2015). Because there is no action for which Signode seeks recovery that is separate from the misappropriation of its trade secret information, the tort claim is preempted as a matter of law.

For the foregoing reasons, the defendants' motion to dismiss is granted as to the claim of tortious interference with contract and denied as to the claim of trade secrets misappropriation. The breach-of-contract claim survives only to the extent of the contract's protection of trade secrets.

Dated: October 20, 2015

John J. Tharp, Jr.
United States District Judge

16